IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN RE | * | CASE NO.: 13-27709 |
| QUIANA BAXTER | * | |
| Debtor | * | Chapter 7 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| QUIANA BAXTER, | * | |
| Plaintiff, | * | |
| -v- | * | |
| SUMMERFIELD INVESTMENT GROUP, LLC | * | |
| | * | |
| Defendant | | ADV. PROC. NO. :14-00386 |

oOo

## PLAINTIFF, QUIANA BAXTER'S,  POST TRIAL MEMORANDUM OF LAW

Quiana Baxter, through her attorneys, Louise M. Carwell, Kay N. Harding and the Legal Aid Bureau, Inc., files this post trial memorandum of law, as requested by this Honorable Court, as states as follows:

## Procedural Posture

A trial in this matter was held on April 9, 2015 and May 5, 2015.  At the conclusion of the trial, the Court asked the parties to address certain questions raised by the Court after the conclusion of the two day trial.  A further hearing for Oral Argument is scheduled for June 17, 2015.

1

**Questions Addressed by the Plaintiff in this Post Trial Memorandum of Law**

Based on the Court's oral request  the questions that are addressed in this memorandum

are as follows:

1.  Whether or not the Defendant was entitled to rent after June 9, 2014, the date of the eviction?

2.  Whether or not the Plaintiff was liable for any rent for January 2014. If the Plaintiff is liable for any rent, was she liable for the full market rent for the month of January, 2014?

3.  What is the effect and importance of any false or misleading statements or misrepresentations made by the Defendant or Thomas Karle, if they in fact occurred?

4.  Why does any action by the Defendant with respect to Section 8 voucher and any housing issue actually matter and result in actionable conduct?

5.  What damages may Quiana Baxter recover?

6.  If Quiana Baxter is entitled to damages why is she entitled to attorney's fees since she is represented by the Legal Aid Bureau, Inc.?

7.  As to the Defendant, why does testimony at the evidentiary hearing regarding criminal violations of a friend of Quiana Baxter and a utility turn off at Ms. Baxter's dwelling matter in this case?

8.   Whether filing a Warrant of Restitution after a bankruptcy filing violated the Automatic Stay and what is meant by "judgment of possession."

## ARGUMENT

### RESPONSE TO ISSUES ONE AND TWO: NO, THE DEFENDANT IS NOT ENTITLED TO RENT AFTER JANUARY 9, 2014, THE DATE OF MS. BAXTER'S EVICTION NOR IS THE PLAINTIFF LIABLE FOR ANY RENT FOR THE MONTH OF JANUARY, 2014.

Before addressing the answer to the questions, Ms. Baxter felt it necessary to begin by

outlining Maryland's landlord tenant law pertaining to failure to pay rent complaints, and

discussing the effects of an expired lease, and relevant portions of the HAP Contract. Thereafter,

questions number 1 and 2 will be answered in this section.

2

A.    Maryland Landlord Tenant Law Regarding Failure to Pay Rent Complaints

In Maryland, a landlord may file a Failure to Pay Rent – Landlord's Complaint For Repossession of Rented Property pursuant to MD Code, Real Property § 8-401.  The complaint is generally for repossession of the property for unpaid, late fees, and court cost. The District Court will issue a summons to a constable or sheriff to serve the summons to the tenant by first-class mail. (MD Code, Real Property § 8-401 (3)). At the court hearing, if the court determines that the tenant owes the landlord unpaid rent, late fees, and court cost, a judgment for possession may be entered in favor of the landlord. MD Code, Real Property § 8-401 (c) (2)(ii). The tenant or landlord may appeal the court's ruling within four (4) days "from the rendition of the judgment." (MD Code, Real Property § 8-401 (f) (1).)

The four (4) day appeal period is governed by MD Code, Real Property § 8-401 (f) (1) and the computation of time period is governed by Md.  Rule, Rule 1-203 in pertinent part, which  states:

> in computing any period of time prescribed by these rules, by rule or order of court, or by any applicable statute, the day of the act, event, or default after which the designated period of time begins to run is not included….; but if the period of time allowed is seven days or less, intermediate Saturdays, Sundays, and holidays are not counted. The last day of the period so computed is included unless: (1) it is a Saturday, Sunday, or holiday, in which event the period runs until the end of the next day that is not a Saturday, Sunday, or holiday; or (2) the act to be done is the filing of a paper in court and the office of the clerk of that court on the last day of the period is not open, or is closed for a part of the day, in which event the period runs until the end of the next day that is not a Saturday, Sunday, holiday, or a day on which the office is not open during its regular hours.

If no appeal is filed by the landlord or the tenant within the prescribed timeframe, judgment becomes final and the court may issue a warrant, upon a landlord's Petition-For Warrant of Restitution, which allows the sheriff or constable to "remove from the premises, by

3

force if necessary, all property of the Defendant(s) and any other occupant." (MD Code, Real Property § 8-401 (d) (1) (i).)

B.     The Defendant Cannot Maintain a Claim for Rent For an Expired, Terminated Lease

The Defendant's claim for rent, as a part of the post discharge collection action, was improper.  On March 30, 2010, Quiana Baxter signed a three year residential lease with Summerfield Investment Group LLC. (Exhibit 2 and Exhibit 14).  The lease commenced on May 1, 2010 and ended on April 30, 2013.  Ms. Baxter did not initial or sign the automatic renewal clause contained in paragraph 2 of her lease. (Md. Real Property §8-208 (e)(2); (Exhibit 14 & 21). Thus, at the expiration of the three-year lease, Ms. Baxter's tenancy automatically became a month-to-month tenancy pursuant to Md. Real Property §8-402 (c), which states that "when a landlord consents to a holdover tenant remaining on the premises, the holdover tenant becomes a .. a periodic month-to-month tenant…" *Id.*

Concurrently, On March 30, 2010, Summerfield Investment Group LLC and the Public Housing Agency signed the Housing Assistance Payment Contract (HAP Contract) for the Section 8 Tenant-Based Assistance Housing Voucher Program for the property located at 12 N. Potomac Street, Baltimore, MD 21224. The HAP Contract defines a lease as " the written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by the HUD." (Exhibit 27, Paragraph 17 under "Definitions" section, page 10 of 10).

Part C of the HAP Contract: Tenancy Addendum, Paragraph 2 (a), states that the "owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum." (Exhibit 27; Part C of HAP Contract: Tenancy Addendum 2(a).) Additionally, pursuant to 24 CFR 982.308 (f)(2), "all provisions in the HUD–

4

required tenancy addendum must be added word-for-word to the owner's standard form lease that is used by the owner for unassisted tenants. The tenant shall have the right to enforce the tenancy addendum against the owner, and the terms of the tenancy addendum shall prevail over any other provisions of the lease." (*Id.,* See also Part C of HAP Contract: Tenancy Addendum 2(b).) Further, "if there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control." (Exhibit 27: Part C of HAP Contract: Tenancy Addendum 2(b).)

Part B of the HAP contract, stipulates that "during the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month." (Part B of HAP Contract: Body of Contract, PHA Payment to Owner, Paragraph 7(a)(1); See also 24 CFR 982.451). Additionally, "housing assistance payments shall only be paid to the Owner while the family is residing in the contract unit during the term of the HAP. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moved out." (Part B of HAP Contract, Paragraph 7(a)(4).) PHA payments to the owner " … must continue to make housing assistance payments to the owner in accordance with the HAP contract until the owner has obtained court judgment or other process allowing the owner to evict the tenant. The PHA may continue such payments until the family moves from or is evicted from the unit." (24 CFR 982.311 (b).)

Monthly rental payments to the owner may cease if the "HAP Contract terminates" or The PHA terminates assistance for the family." (24 CFR 982.311 (c) (2)(3); See also 24 CFR 982.309 (b)(2)(iii)). Further, Part C of HAP Contract: Tenancy Addendum, paragraph 10 titled PHA Termination of Assistance, states, "the PHA may terminate program assistance for the family for any grounds authorized in accordance with the HUD requirements. If the PHA

terminates program assistance for the family, the lease terminates automatically." (Part C of HAP Contract, Paragraph 10; See also, Part C of HAP Contract, Paragraph 9).

A tenant "is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment." (Part C of HAP Contract: Tenancy Addendum, Paragraph 5(a)). Conversely, "the family is not responsible for payment of the portion of rent to owner covered by the housing assistance payment under the HAP contract between the owner and the PHA." (24 CFR 982.451 ((b)((4)(iii); See also 24 CFR 982.310 (b)).

On December 4, 2013, Ms. Baxter received notice from the Housing Authority of Baltimore City Housing Voucher Program that she would be terminated from the program effective January 7, 2014. (Exhibit 16). On January 29, 2014, after an informal hearing to retain her voucher, Ms. Baxter received notice that the decision to terminate her from the program was affirmed. (Exhibit 18).

This Court requested that the parties address whether or not Ms. Baxter should be held liable for rent after January 9, 2014, the date of her eviction, and whether or not Ms. Baxter was liable for rent for the entire month of January 2014. (Exhibit 17). First, Ms. Baxter has found no legal authority which would make her believe that she should be held liable to Summerfield Investment Group, LLC for rent after January 9, 2014 when the HAP Contract was terminated and she no longer had any use and occupancy of the premises due to the eviction.

Second, Ms. Baxter does not believe that she is liable for the full market rent of $1,420.00 for the entire month of January. Ms. Baxter testified that she removed most of her belongings from the property before January 7th. On or about January 7th, she went to the property to complete her move and clean the property. Upon entering the property, she determined that it appeared that someone -- the landlord, or the landlord's agent had come into

6

her home. Due to her safety concerns, she left the property without completely cleaning and

removing her belongings. On January 7, 2014, the HAP Contract was terminated and prior to that

date, her lease had expired – thus Ms. Baxter had no contractual obligations to Summerfield

Investment Group, LLC for rent after January 7, 2014. Mr. Karle testified that he had not had

Ms. Baxter execute a new lease after she filed her bankruptcy petition.

Ms. Baxter's monthly rental portion to the landlord was $584.00 prior to her eviction and she
was not responsible for the "housing assistant payment under the HAP contract between the
owner and the PHA." (24 CFR §982.451 ((b)(4)(iii).)  Since, the PHA did not have to pay Mr.
Karle for rent for the month of January, it is reasonable to assume that Ms. Baxter was also not
responsible for her portion of rent either.

**RESPONSE TO ISSUE NO. THREE AND FOUR: THE ACTIONS AND FAILURE TO
ACT BY THE DEFENDANT, SUMMERFIELD INVESTMENT, LCC AND ITS
PRINCIPAL, THOMAS KARLE, IN MAKING FALSE OR MISLEADING
STATEMENTS TO THE DEFENDANT AND IN FAILING TO COMMUNICATE
CORRECT INFORMATION TO THE SECTION 8 PROGRAM IS IMPORTANT
BECAUSE IT RESULTED IN A VIOLATION OF THE AUTOMATIC STAY THAT IS
ACTIONABLE PURSUANT TO 11 U.S.C. §362(K).**

The actions and the failure to act and statements made to Plaintiff by the Defendant

violated the automatic stay and meet the requirements of 11 U.S.C. §362(k).  Specifically, the

Defendant violated the stay  with respect to communicating to  Ms. Baxter's that her lease

terminated due to her bankruptcy filing,  by pursuing pre-petition rent court actions,  and failing

to advise Section 8 that he could not collect past due rent and therefore there was no basis from

the Section 8 program terminating Ms. Baxter's voucher.  Individually and collectively the

actions and statements of the Defendant did substantial injury to Ms. Baxter and were willful.

The harm accomplished not only to create false beliefs as to the effect of filing bankruptcy in the

mind of Ms. Baxter but also resulted in failure to advise the state court of the filing of the

bankruptcy.  Further by failing to step forward and correct the decision of the Section 8 hearing

officer or by actively engaging in an omission that led to the termination of Ms. Baxter's Section

8 voucher, these actions and created tremendous anxiety and worry for Ms. Baxter. The
automatic stay is one of the single most powerful tools available to a party under any federal law.
The stay encompasses such a broad range of actions that unless something is specifically
excepted from 11 U.S.C. §362(a), a creditor, especially one with notice of a bankruptcy must
ensure that its actions do not violate the stay. Stay violations may not always translate into
something actionable but 11 U.S.C. §362(k) provides for a cause of action against a creditor for
injury to an individual by a willful violation of the stay.

  If a creditor knowingly commits a violation, it is willful. " A violation of the automatic
stay subjects the violating creditor to liability for damages, but only if it is willful. §362(k)(1).
The Fourth Circuit Court of Appeals has stated that in the context of §362(k)(1), willfulness does
not require the specific intent to violate the automatic stay, only that the creditor knew of the stay
and intentionally committed an act in violation of the stay". *In re Ojiegbe,* 512 B.R. 513(Bankr.
Dis. Md., 2014) *citing to Citizens Bank of Maryland v. Strumpf,* 37 F.3d 155, 159(4th Cir.1994)
*rev's on other grounds,* 516 U.S. 16, 116 S. Ct. 286 (1995); *Budget Serv. Co. Better Homes*, 804
F.2d 289, 292-93(4th Cir. 1986). There is no need to show that the creditor's actions were
motivated by malice. The creditor need not intend to violate the stay, it is only necessary that the
actions that violated the stay were intentional acts.

  The court in *In Re Daniels*, 206 B.R. 444, 445 (Bankr.E.D.Mich.1997) held that once the
requirements for 11 U.S.C. §362(k)(1) were met, the statute created it own strict liability. "A
specific intent to violate the stay is not required, or even an awareness by the creditor that her
conduct violated the stay. It is sufficient that the creditor knows of the bankruptcy and engages
in deliberate conduct that, it so happens, is a violation of the stay. Moreover, where there is
actual notice of the bankruptcy it must be presumed that the violation was deliberate or

8

intentional." *Id.* Thus, there is no defense to 11 U.S.C. §362(k) based on a good faith belief that the actions did not violate the automatic stay. *TranSouth Fin'l Corp. Sharon (In re Sharon)* 234 B.R. 676, 688 (6th Cir. B.A.P.1999).

A willful violation, even if it begins innocently, is not excusable if the creditor fails to prevent or rectify a stay violation. In *In Re Johnston, 321 B.R. 262 (Bank.D.Ariz. 2005)*, the debtor appealed a decision from the Bankruptcy Court that did not hold creditors in violation of the stay. In reviewing the obligations of the creditor with respect to the automatic stay, the Court agreed with the debtor and found instructive holdings of many other courts that "… emphasized the obligation of creditors to take affirmative action to terminate or undo any action that violates the automatic stay" *Id.* at 283. The Court also stated in its decision that "[t]he responsibility is placed on the creditor and not on the debtor because to place the burden on the debtor to undo the violation " 'would subject the debtor to the financial pressures the automatic stay was designed to temporarily abate.'" *citing to Ledford v. Tiedge (In the Matter of Sams),* 106 B.R. 485, 490 (Bankr.S.D.Ohio 1989) (quoting *In re Miller,* 22 B.R. 479, 481 (D.Md.1982)). "One of [the] purposes of [the automatic stay] is to protect the debtor from having to convince a state court judge that the state court matter should not proceed." *citing to In re Sutton,* 250 B.R. at 774 *citing In re Weisberg,* 218 B.R. 740, 752 (Bankr.E.D.Pa.1998). Though "state court judges generally refrain from proceeding once they are made aware of a bankruptcy filing, the burden is on the creditor not to seek relief against a debtor in violation of the stay." *Id.* As the bankruptcy court in *In Re Johnston citing to Elder v. City of Thomasville (In re Elder),* 12 B.R. 491 (Bankr.M.D.Ga.1981) pointed out: "The creditor sets in motion the process. The creditor is very much in the driver's seat and very much controls what is done thereafter if it chooses. If the

continuation is to be stayed, it (the creditor) cannot choose to do nothing and pass the buck to the debtor."

The Court in *Skillforce, Inc. v. Hafner*, 509 B.R. 523 (D.C. E.D.Va.2014) recently explored the issue of the creditor's affirmative duty to act as imposed by the automatic stay. After reviewing many cases on that subject the court opined that the "…thread that ties these cases together and harmonizes them is the principle that may be stated as follows:  A creditor or the creditor's legal representative has an affirmative duty, post-petition, to discontinue any proceeding it has initiated or continued, or to take other appropriate steps to halt that proceeding if the proceeding jeopardizes or threatens in any way the integrity of the bankruptcy estate, or (ii) exposes the debtor to harassment or coercion or otherwise inhibits the debtor's "breathing spell from [her] creditor".  *Id* at 531(footnote omitted).

Here, admissible evidence introduced in pre-filed exhibits showed that the Defendant filed three court actions in the District Court of Maryland for Baltimore City.  The defendant did not file his two Petition For Warrant of Restitution until after Ms. Baxter filed her bankruptcy.  Ms. Baxter filed her chapter 7 bankruptcy on October 18, 2013 and notice was sent by the Court to all creditors listed on October 21, 2013.  The Defendant was listed as a creditor and acknowledged in court receiving notice and also acknowledge that Ms. Baxter gave Mr. Karle oral notice prior to and after filing.

At no time after filing for the two Petitions For Warrants of Restitution did the Defendant advise the District Court of Maryland that it had learned that a bankruptcy was filed.  Ms. Baxter testified during the trial that she wanted to remain in the property but Mr. Karle told her that she could not remain, her lease was terminated, he could not accept further rent from her, and that he really could not even speak with her.  All of these statements were false.

10

Further at no time did the Defendant advise Section 8 that because Ms. Baxter had filed bankruptcy, any rent that she owed to Summerfield Investments Group, LLC for prepetition rent was discharged. The basis for the termination of Ms. Baxter's subsidy was for non-payment of rent. Thus, the basis that Section 8 used to terminate her housing voucher, was in fact without merit. The Defendant testified at trial that Ms. Baxter notified Mr. Karle that she had received notice from Section 8 that she was to be terminated from the Section 8 program and Mr. Karle also testified at trial that he was notified of the hearing that was scheduled on Ms. Baxter's termination. [2] Mr. Karle testified that while he did not go to the hearing, he made sure that he sent a representative of the Defendant to observe. This representative, John Teluk, was the same individual that Mr. Karle used to meet with tenants and have them present and sign leases for his property. Mr. Karle testified that Mr. Teluk had no knowledge of Ms. Baxter's bankruptcy and did not communicate during the hearing that the pre-petition rent was not owed, which was the basis of the termination hearing. After the hearing, Mr. Karle never followed up with Section 8 to advise section 8 that Ms. Baxter owed no prepetition rent.

Mr. Karle affirmatively updated his "Statement of Account" and testified that Ms. Baxter did not owe rent for the months of August, September, and October, but failed to communicate that fact to Section 8.

Thus the reasons that the actions or inactions of the Defendant are important are because individually and collectively the actions and statements of the Defendant did substantial injury to Quiana Baxter and were willful. The harm accomplished creating false beliefs as to the effect of filing bankruptcy in the mind of Ms. Baxter. The Defendant failed to advise the state court of the

---

[2] At trial, on April 9, 2015, Mr. Karle testified that he received a call thirty minutes before the Section 8 hearing notifying him of the hearing. At trial on May 5, 2015, Mr. Karle could not recall if he learned from Section 8 of the termination hearing immediately before the hearing, sometime earlier in the day on the day of the hearing, or a few days before the hearing.

filing of Ms. Baxter's bankruptcy, failed to step forward and correct and actively engaged in an omission that led to the termination of Ms. Baxter's Section 8 voucher which created tremendous anxiety and worry for Ms. Baxter.  This harm is no less destructive and concrete than a creditor with notice of a bankruptcy filing that fails to halt a garnishment, call off a sheriff in a foreclosure sale, or stop any other type of debt collection activity. The loss that Ms. Baxter experienced was the loss of a tangible benefit – her section 8 voucher – that led to actual money damages and distress for the Debtor which was impermissible under the automatic stay.

**RESPONSE TO ISSUE FIVE:  QUIANA BAXTER IS ENTITLED TO RECOVER ACTUAL, CONSEQUENTIAL AND PUNITIVE DAMAGES AND ATTORNEY'S FEES BECAUSE THE DEFENDANT VIOLATED THE AUTOMATIC STAY AND THE DISCHARGE INJUNCTION**

Quiana Baxter is entitled to damages for the Defendant's violation of the automatic stay and the discharge injunction.  In response to Question Three, Ms. Baxter responded to the Court's question as to the automatic stay violation but did not set out the amount and type of damages for those violations and therefore she will respond to that in this section.  This section, will also discuss the violations of the Discharge and then set out the damages that Ms. Baxter she seeks as a result of those violations.

A. Damages for Violations of the Automatic Stay

Section 362 (k)(1) states that "… an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages. The Court in *In re Seaton*, 462 B.R. 582(Bankr.E.D.Va. 2011) noted that the "…Bankruptcy Code supplies no definition of "actual" damages nor does the legislative history of this section enlighten as to Congressional intent beyond the specific statutory language". *Id* at 594.  The Court in *Seaton* and Courts in the Fourth Circuit relied on certain standards to determine damages.  "The debtor, as the party seeking

12

damages for willful stay violations has the burden of proving by a preponderance of the evidence that a willful stay violation occurred, that damages were suffered and that the amount of relief requested is appropriate." *Green Tree Servicing, LLC v. Taylor (In re Taylor),* 369 B.R. 282, 286 (S.D.W.Va.2007). "For purposes of Section 362(k), actual damages should be awarded only if there is concrete evidence supporting the award of a definite amount. A damages award cannot be based on mere speculation, guess or conjecture" *In re Rawles,* 2009WL 2924005(Bankr.D.Md. 2000)(unreported decision) *citing to Heghmann v. Indorf (In re Heghmann), 316 B.R. 395, 405(B.A.P. 1ˢᵗ Cir.2004).* In addition to the actual pecuniary loss that a Debtor proves, many courts in the Fourth Circuit have allowed damages for emotional distress an available component of 'actual damages' under §362(k). *In re Seaton* at 601, *citing to Green Tree Servicing, LLC v. Taylor (In re Taylor),* 369 B.R. 282, 288-289(S.D.W.Va.2007 (affirming bankruptcy court's award of emotional distress damages to compensate debtor for fear, emotional trauma, and stress that triggered debtor's preexisting medical condition as a result of two separate stay violations by same creditor); *Weatherford v. Timmark (In re Weatherford),* 413 B.R. 273, 289 (Bankr.D.S.C.2009) (finding that, although the debtor did not present evidence of a medical injury, "she did present credible and convincing testimony indicating that she suffered from anxiety and depression as a result of" the stay violation (which included continued collection efforts and retention of property of the estate) that "requir[ed] medication and counseling," and awarding $1,000.00 for emotional distress damages); *Lofton v. Carolina Fin., LLC (In re Lofton),* 385 B.R. 133, 141 (Bankr.E.D.N.C.2008) (awarding $1,500.00 in emotional distress damages for "tension, anger, worry and disruption" suffered by debtor due to creditor's willful violation of automatic stay by commencing small claims court action against the debtor despite

13

receiving notice of the bankruptcy filing, even though suit was dismissed immediately upon receipt of debtor's adversary complaint).

As a result of the decisions of other Courts, the *Seaton* Court decided to take a middle course. The Court explained this as "… not barring emotional distress damages without the demonstration of a causally-related financial loss, as the Seventh Circuit Court of Appeals has ruled, *see Aiello v. Providian Financial Corp.,* 239 F.3d 876, 880–81 (7th Cir.2001), but laying out very strict requirements of proof for an award of emotional distress damages, much as Judge Jones demanded in *In re Ventura–Lysenko* mandating that a debtor "(1) suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation of the automatic stay" in order to recover. *In re Ventura– Linenko,* 2011 WL 1304464, at *9. This course would recognize the reality that some stay violations by the nature of their circumstances do inflict genuine emotional distress that should be compensable but also remind that the principal purpose of § 362(k) is to deter stay violations and to provide redress for economic injury. Suffice it to say, caution should be high among the guiding principles of a court in awarding compensation for emotional distress in this context." *Id.*

The actual financial damages that Ms. Baxter suffered stem from  the loss of her Section 8 voucher.  Ms. Baxter testified that she had to move from the Defendant's property where she was paying rent at a rate of $584.00 to a landlord that was not a section 8 landlord and pay $1,100.00 per month for rent once her voucher was terminated.  The difference in rent per month was and an additional $516.00. multiplied by 15 months she had to pay the addition rent comes to a total of $7224.00.

14

Fortunately, through the intervention of her counsel, Ms. Baxter was reinstated to the Section 8 voucher program on June, 2014 as she testified in court and was stated in her Complaint. However, as Ms. Baxter had entered into a one year lease with her new landlord she could not enter into another lease for a reduced rent until the one year lease expired. In addition, as testified to and included in her Verified Statement of Plaintiff, Quiana Baxter, pursuant to 27 U.S.C. section 1746 and Local Bankruptcy Rule 7016(d)(1) Ms. Baxter had to pay the new landlord a security deposit of $ 1,100.00 and rent a truck to move her items from her prior address to the new address. This came to a total amount in damages of $7,740.00 that is an actual sums that Ms. Baxter had to pay as a result of the Defendant's willful violations.

In addition to her actual damages, Ms. Baxter testified at several times during the trial that the fact that she was made to believe that her lease was terminated, that she could not pay rent to the Defendant, even post petition to reside at the apartment, and the loss of her section 8 voucher all contributed to a tremendous amount of worry that would result in her losing her housing and possibly she would be separated from her children. This type of emotional harm should also be compensated.

In addition, in this Court, when considering an award of punitive damages, the Court in *In re Rawles* relying on *Heghmann v. Indorf (In Re Heghmann)*, 316 B.R. 395, 405 (B.A.P. 1st Cir.2004) acknowledged that such an award required more than just a willful violation of the automatic stay. "Relevant factors courts consider when determining whether punitive damages should be awarded include (1)the nature of the creditor's conduct; (2) the creditor's ability to pay damages; (3) the motive of the creditor; and (4) any provocation by the debtor. Id at *II. In the present case, the Defendant acted in various ways to violate the automatic stay and the actions were willful but also intentional. The Defendant did not question whether it was actually

taking steps to comply with the automatic stay but instead acted recklessly or deliberately. The Defendant is a large rental operation, well versed in Section 8 procedures, in constant contact with Section 8 and its employees, who realized that it was not going to be able to collect a judgment and past due rent from Quiana Baxter, and took steps to ensure she would suffer as a result.

### B. Violations of the Discharge

Quiana Baxter is entitled to damages as a result of the Defendant's willful violation of the discharge injunction. The Defendant filed a collection case in the District Court of Maryland for Baltimore City within a few weeks of this Court entering a Discharge in Ms. Baxter's bankruptcy case. The Defendant filed that case pro se and in its Complaint asked for damages based on past due rent, alleged damage to the unit, and attorney's fees associated with the Motion to Lift the Automatic Stay. As Ms. Baxter maintained in her Response to Defendant's Motion to Dismiss Adversary Proceeding, docket entry 19, it is her position that all damages demanded from her in the District Court Case filed by the Defendant were directly related to the prepetition lease and were discharged. The filing of the lawsuit was in violation of 11 U.S.C.§524(a)(2) and even when the Defendant was notified by Ms. Baxter's counsel of the violation, the Defendant did not dismiss or withdraw the lawsuit. Ms. Baxter's counsel had to file a Motion in the District Court and attend a hearing to ensure that the District Court would stay the proceedings. *See* Pre Filed Exhibits of Quiana Baxter, Exhibit 21.

11 U.S.C.§524(a)(2) "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived. As this Court has recognized, "...a Bankruptcy Court is authorized to invoke §105 of the

16

Bankruptcy Code to enforce the discharge injunction imposed by §524 an order damages, including actual damages, attorney's fees and punitive damages, if warranted." *In re Sharpe*. 2007 WL 1171083(Bankr.D.Md. 2007) (unreported decision) *citing to In re Torres*, 432 F.3d 2027 (1ˢᵗ Cir. 2005) and *In re Hardy*, 97 F.3d 1384, 1389-90 (11th Cir. 1996). The standard used to assess a willful violation under 11 U.S.C. §362 is also to be used when assessing a willful violation of 11 U.S.C.§524. *In re Cherry,* 247 B.R. 176, 187(Bankr. E.D.Va.2000).

      Damages were granted to debtors that are harmed by the actions of a creditor to continue collection action post discharge because Courts recognize the fundamental protection of the discharge injunction. In *In re Barbour*, 77 B.R. 530(Bankr.E.D.N.C. 1987) a debtor was sued in state court for a discharged debt. The creditor had full knowledge of the filing and the discharge. The Court found damages had to be assessed to compensate the debtors for their humiliation, inconvenience, and anguish that they suffered in connection with the lawsuit filed by the creditor. *Id* at 531. In reaching its decision, the Court held that the "…discharge and the discharge injunction are the most important components of a debtor's fresh start. Violations of the discharge injunction are not to be treated lightly-intentional violations will not be tolerated by this court." *Id*. The Court in *In re Youngkin,* 2014 WL 789117(Bankr. E.D.N.C.) also granted actual damages for willful contempt of the discharge against a mortgage servicer that had sent several collection letter based on the debtor's mental distress, anxiety, travel expense, and appearance in Court and awarded attorney's fees. Further in *In re Curtis,* 322 B.R. 470 (Bank.D.Mass.2005), the Court granted actual damages for emotional distress, attorney' s fees, costs and punitive damages for violations of a junior mortgage creditor. In awarding actual damages the Court in *Curtis* considered the testimony of the Defendant regarding the stress and anxiety brought on by the creditor's behavior. When the Court turned to punitive damages, it

17

recognized that court have discretion in arriving at imposing this type of relief however the Judge in *Curtis* found such an award appropriate "…where there has been an "arrogant defiance" of the bankruptcy Code, punitive damages are most appropriate….Here the defiance was far from subtle". *Citing to In re Medlin*, 201 B.R. 188(Bank.E.D.Tenn.1996).  In the present case Ms. Baxter testified at trial that upon receiving the District Court Complaint she was became incredibly concerned that once again her wages could be subject to garnishment and this caused her tremendous anxiety.  She was able to find counsel and she then had to affirmatively pursue actions against the Defendant to ensure that the District Court action was stayed including meeting with her counsel and coming to court on several occasions.   Had Ms. Baxter not found counsel, it is likely that what she feared would have become a reality and she would have faced another garnishment.  Further, the Defendant, even in the face of notice from the Defendant's counsel that it could not proceed due to the Discharge Injunction, did not take any steps to voluntarily halt post discharge collection action; essentially Ms. Baxter had to force the issue by filing this adversary proceeding.  As a result of the Defendant's failure to comply with the Discharge Injunction and display any inclination to obey the Order,  Ms. Baxter she should receive actual damages, punitive damages and attorney's fees.

## RESPONSE TO ISSUE SIX: QUIANA BAXTER IS ENTITLED TO ATTORNEY'S FEES WHEN SHE IS REPRESENTED BY THE LEGAL AID BUREAU, INC. AS A PREVAILING PARTY.

        Quiana Baxter has demonstrated that she is entitled to damages in this case and a Plaintiff that establishes damages pursuant to 11 U.S.C. §362 and 11 U.S.C. §542 must also be awarded attorney's fees.  This Court asked why attorney's fees should be awarded because the Plaintiff was represented by the Legal Aid Bureau, Inc., a private nonprofit corporation that does not charge clients for legal representation.  The answer lies mainly in the fact that to deny attorney's

18

fees in this case based on the fact that Ms. Baxter did not have to pay for legal representation as she qualified for the no cost representation through the Legal Aid Bureau is at odds with the tenets of equal justice and treats Ms. Baxter's claims that are before this Court differently than those of another litigant because of her financial standing. The law requires attorney's fees for a prevailing Plaintiff/Debtor and does not discriminate based on who is counsel for the Plaintiff or the ability of the Plaintiff/Debtor to pay for legal representation. No double standard is to be permitted.

It is the legislative intent of Congress that legal services programs that receive federal funding should be entitled to attorney's fees to further equal access to justice. A portion of the Maryland Legal Aid Bureau's funding comes from the Legal Services Corporation ( LSC), a federal nonprofit corporation founded by the United States Congress the provides funds, training and technical assistance to civil legal aid programs. Between 1996 and April 26, 2010, Legal Services programs that received any federal funding through LSC were not permitted to request or receive attorney's fees for the clients that they served because Congress placed a restriction on federally funded legal services programs to even request attorney's fees. In April 2010, the attorney's fees restriction was stricken in recognition that Congress had a "change of heart". 45 CFR Parts 1609, 1610 and 1642, final rule published in the Federal Register, Vol.75, No.79, Monday, April 26, 2010, p. 21507. As a result, the Legal Services Corporation, adopted final regulations in 2010 to reflect the changing will of Congress. *Id.*

The comments in the Federal Register, volume 75, No.79/ Monday, April 26, 2010, p. 21507 states:

> Moreover, LSC agrees that the restriction imposes unnecessary burdens on recipients and places clients at a disadvantage with respect to other litigants. Specifically, the ability to make a claim for attorneys 'fees is often a strategic took in the lawyers' arsenal to obtain a favorable settlement from the opposing side. Restricting a recipient's ability to avail

19

itself of this strategic took puts clients a disadvantage and undermines clients' ability to obtain equal access to justice. The attorneys' fees restriction can also be said to undermine of the primary purposes of the fee shifting states, namely to punish those who have violated the rights of persons protected under such states. In addition, in a time of extremely tight funding, the inability of a recipient to obtain otherwise legal available attorney's fees places an unnecessary financial strain on the recipient. If a recipient could collect and retain attorneys fees, with would free up other funding of the recipient to provide service to addition clients and close the justice gap. Foot note omitted]. More fundamental, the restriction results in clients of grantees being treated differently and less advantageously than all other private litigants, which LSC believes is unwarranted and fundamentally at odds with the Corporation's Equal Justice mission.

There is no legal basis to treat Ms. Baxter's claim for attorney's fees differently than any other prevailing litigant simply because she is a client of the Legal Aid Bureau, Inc. If this court should find that Ms. Baxter is entitled to actual and punitive damages, then the Court must also award attorney's fees as if she were any other prevailing party before this Court.

It is also worth noting that without either free or pro bono services, it is extremely unlikely that Ms. Baxter's claims would have come before this Court. Ms. Baxter's low income and a wage garnishment were the cause of her filing for bankruptcy protection. After her petition was filed and after her discharge, the Defendant violated the most basic and important provisions of the Bankruptcy Code, the automatic stay and the discharge. However, Ms. Baxter did not have the knowledge or the tools to enforce those provisions and in all likelihood the chances of finding private counsel who would file an adversary complaint to untangle the serious issues she faced, without requiring at least a retainer that Ms. Baxter counsel not afford were slim. It is also unlikely that a many private practioners would be able to quickly address and begin to resolve bankruptcy issues and subsidized housing issues at the same time other than the Legal Aid Bureau, Inc. Legal Aid Bureau, Inc. has significant experience handling housing and consumer bankruptcy issues on a daily basis because of the low income issues that it must resolve for its clients.

20

The United States Supreme Court addressed the payment of attorney's fees to legal services attorneys in the case of *Blum v. Stenson*, 465 U.S. 886 (1984).  The Blum case considered the rate of compensation for attorneys fees paid to legal services attorneys in a federal civil rights case.  The Court held that legal services attorney's rates should be based on prevailing market rates for private practioners in the community not the cost of the petitions attorney's service to their program.  *Id* at 894-897

**RESPONSE TO ISSUE SEVEN:**

**This questions was only asked of the Defendant and therefore the Plaintiff is presenting no response to this Question.**

**RESPONSE TO ISSUE EIGHT: THE DEFENDANT VIOLATED THE AUTOMATIC STAY BY FILING THE WARRANT OF RESTITION AFTER A BANKRUPTCY FILING.**

Before directly addressing the answer to the question, Ms. Baxter felt it necessary to explain the meaning of  "judgment of possession."

A.    Definition of Judgment of Possession Pursuant to 11 U.S.C. §362 (22)

The Law Dictionary defines "final decision, final judgment, or final order" as "a decree or judgment of a court which terminates the litigation in the court which renders it." (The Law Dictionary, 2002, Anderson Publishing Co.). Similarly, Ballentine's Law Dictionary defines "final judgment as "a judgment which determines and disposes of the whole merits of the cause before the court by declaring the plaintiff is or is not entitled to recovery by the remedy chosen, or completely and finally disposes of a branch of the cause which is separate and distinct from other parts thereof." (Ballentine's Law Dictionary, 2010, 27 Am J2d Eq § 245.)

The bankruptcy code does not define "judgment for possession." (*In re Nitzsky*, 516 B.R. 846, 848 (Bankr.W.D. N. C.,2014); *See also In re Alberts,*381 B.R. 171,177(Bankr. W.D. Pa.,

2008). The Court relying on the 2004, 8th edition of Black's Law Dictionary, defined "judgment" as a *court's final* determination of the rights and obligations of the parties in a case. Thus, according to Black's Law Dictionary, finality is a key component to any court order having the legal effect of a binding judgment." *Id.* at 178. Similarly the court in *In re Nitzsky* held that "in accord with the common meaning of  "judgment," the court holds that a court order must be final and non-appealable to meet the definition of judgment for possession under § 362(b)(22)." *In re Nitzsky*, 516 B.R. at 848.

In re Nitzsky, 516 B.R. 846, the creditor landlord filed an "Application to the Court for Judicial Assistance Determining that 11 U.S.C. § 362 (b)(22) Applies." *Id* at 846. The Court held that the exception to the automatic stay did not apply because the landlord did not have a judgment of possession before the Debtor filed a petition under the Bankruptcy code. In *Nitzsky*, on March 17, 2014, the landlord was granted a summary ejectment, "but could not have executed on it until March 28 when the appeal period expired.[3] When the Debtor filed for bankruptcy relief on March 27, 2014, the Summary Ejectment was still subject to appeal." *Id.* at 849.  This case is instructive in two ways in (1) identifying that a prudent landlord should seek the assistance of the Bankruptcy court to determine the applicability of code to determine if the creditor is entitled to the automatic stay pursuant to 11 U.S.C. § 362 (b)(22); and (2) to provide

---

[3] "Under North Carolina law, a magistrate judge issues a judgment in an action for summary ejectment if the judge determines that a tenant has unjustifiably defaulted on the payment of rent. N.C. GEN.STAT. §§ 7A–210, 42–26. Once granted, a judgment in action for summary ejectment is subject to appeal for a period of ten days. N.C. GEN.STAT. § 7A–228. Moreover, during the ten-day appeal period, an action to evict the tenant is stayed per N.C. GEN. STAT. § 1–310, so the holder of a judgment in action for summary ejectment may not execute on the judgment during the ten-day appeal period. Simply put, a judgment in action for summary ejectment is not final when it is subject to appeal. Accordingly, a judgment in action for summary ejectment secured under North Carolina law that is still subject to appeal when a debtor files a bankruptcy petition does not qualify as a judgment for possession under § 362(b)(22) because it is not a final and non-appealable court order." *In re Nitzsky*, 516 B.R. 846, 849 (2014).

instruction on how the Bankruptcy code should define judgment pursuant to 11 U.S.C. § 362 (b)(22) .

**B.     Summerfield Investment Group LLC Violated the Automatic Stay Provision When It had Default Judgments Entered and  Filed Warrant of Restitution For Pre-petition Debt Before Requesting Relief From the Automatic Stay.**

According to 11 U.S.C. §362 it is a violation of the automatic stay when a creditor takes action in "(1) the commencement or continuation, including … of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title; (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11U.S.C. §362(a)(1-3).  The automatic stay takes effect immediately upon the debtor filing of a bankruptcy petition. The reason for the automatic stay is to "protect the debtor from harassment, bother and contact [from creditors] for a reasonable period of time and prevent creditors from engaging in a 'race of diligence'". (cited by *Weatherford v. Timmark Carey Holdings, Inc.* (*In re Weatherford*), 413 B.R. 273, 283 (Bankr. S.C. 2009) in *Miller v. Sav. Bank of Baltimore.* (In re Miller), 22 B.R. 479, 481 (Bankr. D.Md. 1982).

Further, 11 U.S.C. §362 (d)(2)(A)(B), states in relevant part that a party must request relief from the automatic stay "… with respect to a stay of an act against property under subsection (a) of this section, if – (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." The Code terminates the automatic stay "thirty" days after a request under subsection (d) under subsection (a), after a

party of interest makes a request. *Id.*

In the present case, on September 6, 2013, the Defendant obtained a default judgment of possession.[4] Under Maryland law, the Debtor had four days to appeal until the appeal period expired. (Exhibit 11). Ms. Baxter had until September 13, 2013 to appeal. Ms. Baxter did not appeal the judgment but on October 18, 2014, Ms. Baxter filed her Chapter 7 Bankruptcy. On October 21, 2013, Summerfield filed a Petition-For Warrant of Restitution in the District Court of Maryland for Baltimore City, prior to filing a Motion for Relief From Automatic Stay. Second, on October 11, 2013, Summerfield Investment Group LLC obtained a default judgment of possession for pre-petition debt for rent for the month of September 2013. (Exhibit 12). On October 21, 2013, Mr. Karle filed Petition-For Warrant of Restitution to execute on the October 11, 2013 judgment. Under Maryland law, the Debtor had four days to appeal a judgment. (Real Property § 8-401 (f) (1); See, Exhibit 12.) The Debtor, Ms. Baxter had until October 17th to appeal the judgment. On October 18, 2013, the judgment would become final. Third, on October 21, 2013, Summerfield Investment Group LLC obtained a default judgment of possession for pre-petition debt for rent for the month of October 2013. (Exhibit 13). The Debtor, Ms. Baxter had until October 25th to appeal the judgment. On October 26th, the judgment would become final.

On October 29, 2014, a judge in the District of Maryland For Baltimore City signed the petition without knowledge of Ms. Baxter's bankruptcy. (Exhibit 11; Exhibit 12). After the Defendant had taken action in contravention to the automatic stay , through counsel it filed a Motion for Relief of automatic stay on November 7, 2013, regarding the September 6th and

---

[4] In the Disposition section of the Failure to Pay Rent – Landlord's Complaint For Repossession of Rented Property, the court stamped "DEFAULT JUDGMENT ONLY LANDLORD APPEARED FOR TRIAL DEFAULT JUDGMENT FOR POSSESSION DUE & UNPAID: TOTAL AMT. OF RENT AND LATE FEES PER #6 ON TRIAL DATE NOTED ABOVE"

October 11th judgments pursuant to §362 (d).  On December 13, 2013, the Bankruptcy Court

signed order granted relief from the automatic stay.

Summerfield's actions in petitioning the District Court of Maryland For Baltimore City

Petition - Warrant of Restitution were a violation of the automatic stay. The warrant of

restitutions were filed and submitted to the court at the request of the landlord. (Exhibit 11-12).

The District Court of Maryland for Baltimore City does not automatically issue an Order for

restitution without a landlord's affirmative petition. The Order of restitution is received by the

court after the landlord pays a filing fee. See, District Court Administrative Regulations XIX;

MD Code, Courts and Judicial Proceedings, § 7-402. An Order is only granted after the landlord

or landlord's agent "affirm under the penalties of perjury" that the tenant has either made or has

not made the judgment payment and that there is still a balance due to the landlord for the rental

month requested.  On October 21, after Ms. Baxter had filed her petition, the Defendant filed and

paid for  two (2) warrants of restitution – one for a "balance + 8/1/2013" and "9/1/2013" rents in

violation of  §362 automatic stay as he took steps to execute on  judgments where Ms. Baxter did

not owe the funds due to her bankruptcy filing.   Further, when the Defendant petitioned the

District Court for Baltimore City on October 21 for two writs of possession, after Ms. Baxter had

filed for Chapter 7 Bankruptcy, the Defendant had violated the automatic stay. (Exhibit 11-12).

Summerfield violated the automatic stay when it did not take steps to vacate its judgments or

withdraw its petitions for restitution. Even after Summerfield became aware of Ms. Baxter's

bankruptcy it took no affirmative actions to vacate the judgments. Summerfield also violated the

automatic stay when it took these actions without first obtaining an Order from United States

Bankruptcy Court.[5]

_____

[5] Summerfield may have been attempting to cure its violation by filing its Motion for Relief of Stay on November 7, 2013.

25

Additionally, regarding the October 11th and October 21st trials, Summerfield did not obtain a "judgment of possession" that would trigger the exception of the automatic stay pursuant to 362(b)(22) because the judgments were not "final" before Ms. Baxter filed her bankruptcy petition on October 18, 2013. Summerfield's October 11 and October 21 judgments were void and had no legal effect. *In re Weatherford*, 413 B.R. 273, 282(Bankr. D. S.C.2009) (noting that "[a]ctions taken in violation of the automatic stay are void and without effect." *Anderson v. S.C. Nat'l Bank (In re McWhorter),* 37 B.R. 742,745 (Bankr. D.S.C. 1984).

Finally, it is Ms. Baxter's position that the Defendant violated the automatic stay and should have petitioned this Court before filing it warrants of restitutions. In the cases that are cited above even when landlord's believed that there was an exception to the automatic stay pursuant to §362 (b) the landlord-creditors requested by application or motion an order from the bankruptcy court before pursing any future eviction procedures.

Respectfully Submitted,

_____/s/_____
Louise M. Carwell
Fed. Bar No.: 10174


_____/s/_____
Kay N. Harding
Fed. Bar No.: 28697
Legal Aid Bureau, Inc.
500  E. Lexington Street
Baltimore, Maryland 21202
410-951-7786
410-951-7696

*Attorneys for Plaintiff*

26

## POINTS AND AUTHORITIES

### Statues and Codes

**United States Code**

11 U.S.C. §105

11 U.S.C. §362

11 U.S.C. §524

**Code of Federal Regulations**

24 CFR 982.309 (b)(2)(iii)

24 CFR 982.310 (b)

24 CFR 982.311 (b)

24 CFR 982.311 (c) (2)(3)

24 CFR 982.451 ((b)(4)(iii)

45 CFR Parts 1609, 1610 and 1642. ( Final rule published in the Federal Register, Vol.75, No.79, Monday, April 26, 2010)

**Maryland Statutes and Rules**

MD Code, Courts and Judicial Proceedings, § 7-402

MD Code, Real Property § 8-401 (3)

MD Code, Real Property § 8-401 (c) (2)(ii)

MD Code, Real Property § 8-401 (f) (1).

Md Rule, Rule 1-203

### Cases

*Aiello v. Providian Financial Corp.,* 239 F.3d 876 (7th Cir.2001)

*Anderson v. S.C. Nat'l Bank (In re McWhorter),* 37 B.R. 742 (Bankr. D.S.C. 1984)

*Blum v. Stenson, 465 U.S. 886 (1984)*

*Budget Serv. Co. Better Homes*, 804 F.2d 289 (4th Cir. 1986).

*Citizens Bank of Maryland v. Strumpf,* 37 F.3d 155 (4th Cir.1994) *rev's on other grounds,* 516 U.S. 16, 116 S. Ct. 286 (1995)

*Elder v. City of Thomasville (In re Elder),* 12 B.R. 491 (Bankr.M.D.Ga.1981)

*Green Tree Servicing, LLC v. Taylor (In re Taylor),* 369 B.R. 282 (S.D.W.Va.2007)

*In re Alberts,* 381 B.R. 171 (Bankr. W.D. Pa., 2008)

*In re Barbour*, 77 B.R. 530 (Bankr.E.D.N.C. 1987)

*In re Cherry,* 247 B.R. 176 (Bankr. E.D.Va.2000)

*In re Curtis,* 322 B.R. 470 (Bank.D.Mass.2005)

*In Re Daniels*, 206 B.R. 444 (Bankr.E.D.Mich.1997)

*In re Hardy*, 97 F.3d 1384 (11th Cir. 1996).

*In Re Johnston, 321 B.R. 262 (Bank.D.Ariz. 2005),*

*In re Medlin* 201 B.R. 188(Bank.E.D.Tenn.1996)

*In re Nitzsky*, 516 B.R. 846 (Bankr.W.D. N. C.,2014)

*In re Ojiegbe,* 512 B.R. 513(Bankr. Dis. Md., 2014)

*In re Rawles*, 2009WL 2924005(Bankr.D.Md. 2000)(unreported decision)

*In re Seaton*, 462 B.R. 582 (Bankr.E.D.Va. 2011)

*In re Sharpe*. 2007 WL 1171083 (Bankr.D.Md. 2007)

*In re Torres*, 432 F.3d 2027 (1st Cir. 2005)

*In re Ventura–Linenko*, 2011 WL 1304464

*In re Weisberg,* 218 B.R. 740, 752 (Bankr.E.D.Pa.1998)).

*In re Youngkin,* 2014 WL 789117(Bankr. E.D.N.C.)

*Heghmann v. Indorf (In Re Heghmann)*, 316 B.R. 395 (B.A.P. 1st Cir.2004)

*Ledford v. Tiedge (In the Matter of Sams),* 106 B.R. 485 (Bankr.S.D.Ohio 1989)

*Lofton v. Carolina Fin., LLC (In re Lofton),* 385 B.R. 133 (Bankr.E.D.N.C.2008)

*Miller v. Sav. Bank of Baltimore. (In re Miller)*, 22 B.R. 479 (Bankr. D.Md. 1982)

2

*Skillforce, Inc. v. Hafner*, 509 B.R. 523(D.C. E.D.Va.2014)

*TranSouth Fin'l Corp. Sharon (In re Sharon)* 234 B.R. 676, 688 (6th Cir. B.A.P.1999).

*Weatherford v. Timmark Carey Holdings, Inc.* (*In re Weatherford*),413 B.R. 273, (Bankr. S.C. 2009)

## **Secondary Sources**

District Court Administrative Regulations, XIX

Ballentine's Law Dictionary, 2010, 27 Am Jur. 2d Ed § 245

3